1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10    PHIL MCKIBBEN,                          CASE NO. C13-1293JLR

11                        Plaintiff,          ORDER ON CROSS MOTIONS
                                              FOR SUMMARY JUDGMENT
12            v.

13    SNOHOMISH COUNTY,

14                        Defendant.

15                    **I.    INTRODUCTION**

16        The matter comes before the court on the parties' cross motions for summary

17   judgment.  (*See* Plf. Mot. (Dkt. # 20); Def. Mot. (Dkt. # 23).)  This case arises from

18   Plaintiff Phil McKibben's attempts to open an adult cabaret.  Mr. McKibben argues that

19   Defendant Snohomish County's ("County") zoning restrictions on adult entertainment

20   violate the First Amendment.  Having considered the submissions of the parties, the

21   balance of the record, and the relevant law, and having heard oral argument, the court

22

ORDER- 1

1  DENIES Mr. McKibben's motion for summary judgment and GRANTS the County's

2  motion for summary judgment.

3  ## II.   BACKGROUND

4  The following facts are undisputed.  In 1994, the County established an Adult

5  Entertainment Zoning Committee ("Committee") to study the community effects of adult

6  entertainment venues.  (Lubrin Decl. (Dkt. # 28) ¶¶ 2-7; Comm. Rep. (Dkt. # 28-1).)  The

7  Committee reviewed studies of the secondary effects of adult entertainment, ordinances

8  from other jurisdictions, and federal and state court decisions; heard testimony from law

9  enforcement officers and community members; held a public hearing; and authored a

10  final report.  (*See* Comm. Rep.; Olson Decl. (Dkt. # 21) Ex. 7 ("Meeting Minutes"); 1996

11  Ordinance (Dkt. # 28-2); Olson Decl. Ex. 17 (transcript of Council proceedings).)  In

12  1996, the County enacted the following zoning requirements pursuant to the

13  recommendation of the Committee.  (*See* 1996 Ordinance.)

14  First, adult entertainment businesses may only be located on parcels zoned for

15  light industrial, heavy industrial, or industrial park use.  Snohomish County Code

16  ("SCC") § 30.22.100.  Second, adult entertainment businesses must be dispersed a

17  minimum distance from "any public or private school, preschool, educational institution,

18  church or other religious facility, public or private park, youth oriented facility,

19  establishment serving alcohol by the drink," or other parcel whose zoning does not permit

20  adult entertainment use.  SCC § 30.28.015.  For adult entertainment dance studios, such

21  as Mr. McKibbon's proposed adult cabaret, the minimum dispersion distance is 660 feet.

22  *Id.*

1    In August 2011, Mr. McKibben filed an application for a license to operate an

2  adult cabaret at 10809 Mukilteo Speedway in unincorporated Snohomish County.

3  (Lubrin Decl. ¶ 11, Application (Dkt. # 28-3).)  The County denied Mr. McKibben's

4  application because the proposed cabaret was located within 660 feet of two restaurants

5  that served alcohol by the drink.  (Denial (Dkt. # 28-4); *see also* Lubrin Decl. ¶ 11.)  Mr.

6  McKibben was previously a part owner of the only live adult entertainment venue to

7  operate in the unincorporated County within the last 30 years.  (Lubrin Decl. ¶ 8; Def.

8  Mot. at 5.)  This venue closed in 2012 amid allegations by the federal government that

9  the dancers were engaging in acts of prostitution and illegal dancing.  (Lubrin Decl. ¶ 8;

10  Plea Agreement (Dkt. # 27-1) ¶ 4.)

11    To date, Mr. McKibben's 2011 application is only the second application for a live

12  adult entertainment venue that the unincorporated County has received since 1994.

13  (Lubrin Decl. ¶¶ 9-10.)  The County, which stretches from Puget Sound to the Cascade

14  Mountains, comprises 68% forest land, 18% rural land, 5% agricultural land, and only

15  9% urban or city development.  (2013 Annual Rep. (Dkt. # 34-1).)  The majority of the

16  population lives in incorporated cities within the County.  (*Id.*)

17    Upon denial of his application, Mr. McKibben filed this action, alleging that the

18  County's zoning restrictions regarding adult entertainment dance studios violate his First

19  Amendment rights.  (*See generally* Compl. (Dkt. # 1).)  Both parties now move for

20  summary judgment in their favor.  (*See* Pfl. Mot.; Def. Mot.)

21

22

# III.   ANALYSIS

**A.   Summary Judgment Standard**

Federal Rule of Civil Procedure 56 permits a court to grant summary judgment where the moving party demonstrates (1) the absence of a genuine issue of material fact and (2) entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of an issue of material fact in two ways:  (1) by producing evidence negating an essential element of the nonmoving party's case, or, (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party will bear the ultimate burden of persuasion at trial, it must establish a prima facie showing in support of its position on that issue.  *UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994).  That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue.  *Id.* at 1473.

If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a factfinder could reasonably find in the nonmoving party's favor.  *Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  In determining whether the factfinder could reasonably find in the nonmoving party's favor, "the court must draw all reasonable inferences in

1   favor of the nonmoving party, and it may not make credibility determinations or weigh

2   the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

3   When adjudicating cross-motions for summary judgment, a court "evaluate[s] each

4   motion separately, giving the nonmoving party in each instance the benefit of all

5   reasonable inferences." *A.C.L.U. of Nevada v. City of Las Vegas*, 466 F.3d 784, 790-91

6   (9th Cir. 2006).

7   **B.   First Amendment Law**

8          Erotic dancing is protected expression under the First Amendment. *Kev, Inc. v.*

9   *Kitsap Cnty.*, 793 F.2d 1053, 1058 (9th Cir. 1986). The constitutionality of the County's

10  zoning regulations is determined by a three-step framework. *City of L.A. v. Alameda*

11  *Books, Inc.,* 535 U.S. 425, 433-34 (2002) (plurality) (citing *City of Renton v. Playtime*

12  *Theatres, Inc.*, 475 U.S. 41, 50 (1986).) The first inquiry is whether the provision is a

13  complete ban on protected expression or whether it can properly be analyzed as a time,

14  place, and manner regulation of speech. *Id.*; *see also Tollis, Inc. v. Cnty. of San Diego*,

15  505 F.3d 935, 939 (9th Cir. 2007). Here, the County's ordinance does not ban adult

16  entertainment altogether, but rather permits such venues as long as they are distanced

17  from certain sensitive locations. *See* SSC § 30.22.100; SCC § 30.28.015. As such, the

18  ordinance is a time, place, and manner restriction. *See Alameda Books*, 535 U.S. at 433-

19  34 (plurality).

20         The second inquiry is whether the provision is content-based, thus meriting strict

21  scrutiny, or effectively content-neutral, thus meriting intermediate scrutiny. *Id.*; *Tollis*,

22  505 F.3d at 939. A provision is effectively content-neutral if it is aimed at controlling

1    only the secondary effects of live adult entertainment businesses, rather than the content

2    of expression practiced therein. *Alameda Books*, 535 U.S. at 433-34 (plurality); *World*

3    *Wide Video of Wash., Inc. v. City of Spokane*, 368 F.3d 1186, 1191 (9th Cir. 2004). Here,

4    as established by the Committee's final report, the purpose of the County's ordinance is

5    to minimize the negative secondary community effects—such as increased crime rates,

6    declining property values, neighborhood blight, and the exposure of minors to adult

7    entertainment—associated with live adult entertainment businesses. (Comm. Rep. at 10-

8    12.) Accordingly, the County's ordinance is content-neutral. *See Alameda Books*, 535

9    U.S. at 433-34 (plurality).

10          Because the County's ordinance is content-neutral, the third inquiry is whether the

11    ordinance meets intermediate scrutiny. *See id.*; *Tollis*, 505 F.3d at 939. An ordinance

12    satisfies intermediate scrutiny if it is designed to serve a substantial government interest,

13    is narrowly tailored to serve that interest, and reasonable alternative avenues of

14    communication remain available. *Alameda Books*, 535 U.S. at 433-34 (plurality); *World*

15    *Wide Video of Wash.*, 368 F.3d at 1191 (quoting *Center for Fair Pub. Policy v. Maricopa*

16    *Cnty.*, 336 F.3d 1153, 1166 (9th Cir. 2003)). Mr. McKibben raises two challenges to the

17    County's ordinance: (1) that the requirement that adult entertainment dance studios be

18    dispersed 660 feet from establishments serving alcohol by the drink is not designed to

19    serve a substantial government interest, and (2) that the zoning restrictions as a whole do

20    not afford reasonable alternative avenues of communication for exotic dancing. (*See*

21    Mot.) The court addresses each argument in turn below.

22

### 1. Designed to serve a substantial government interest

When enacting a secondary effects ordinance, a municipality "must rely on evidence that demonstrates a connection between the speech regulated and the secondary effects that motivated adoption of the ordinance." *Fantasyland Video, Inc. v. Cnty. of San Diego*, 505 F.3d 996, 1001 (9th Cir. 2007) (quoting *Alameda Books*, 535 U.S. at 441 (plurality)) (internal punctuation omitted). The Supreme Court has "refused to set . . . a high bar for municipalities that want to address merely the secondary effects of protected speech." *Alameda Books*, 535 U.S. at 438-39 (plurality). Accordingly, a municipality can rely on any evidence that is "reasonably believed to be relevant" for demonstrating a connection between the regulated speech and the asserted government interest. *Fantasyland Video*, 505 F.3d at 1001 (quoting *Alameda Books*, 535 U.S. at 438 (plurality)). Moreover, "very little evidence is required." *Alameda Books*, 535 U.S. at 451 (Kennedy, J., concurring).[1]

Under this standard, a municipality is not required to come forward with empirical data in support of its rationale. *Maricopa Cnty.*, 336 F.3d at 1168. The Supreme Court has found that a requirement for empirical evidence "would go too far in undermining [the] settled position that municipalities must be given a reasonable opportunity to experiment with solutions to address the secondary effects of protected speech." *Alameda Books*, 535 U.S. at 439 (plurality). As such, a municipality is entitled to rely on

---

[1] Because Justice Kennedy's concurrence was the narrowest opinion joining the Supreme Court's fractured disposition in *Alameda Books*, to the extent the concurrence departs from the plurality opinion, the concurrence controls. *See World Wide Video of Wash.*, 368 F.3d at 1193 (citing *Marks v. United States*, 430 U.S. 188, 193).

1  anecdotal or testimonial evidence.  *See World Wide Video of Wash.*, 368 F.3d at 1194-95,

2  1197-98; *Maricopa Cnty.*, 336 F.3d at 1168.  Similarly, a municipality need not perform

3  its own studies into secondary effects; rather, "[r]eliance on the experiences of other

4  jurisdictions is sufficient to satisfy the [municipality's] minimal burden at the legislative

5  stage." *Id.* at 1003 (citing *City of Renton,* 475 U.S. at 50-52); *see also City of Erie v.

6  Pap's A.M.*, 529 U.S. 277, 296-97 (2000).

7         Of course, a municipality may not merely "assert that it will reduce secondary

8  effects by reducing speech in the same proportion." *Alameda Books,* 535 U.S. at 449

9  (Kennedy, J., concurring).  And although the bar for showing a substantial government

10  interest is low, that "is not to say that a municipality can get away with shoddy data or

11  reasoning." *Id.* at 438.  Rather, a "municipality's evidence must fairly support its

12  rationale for its ordinance." *Id.*

13         If a municipality's evidence "fairly supports" its rationale, the burden shifts to the

14  plaintiff to "cast direct doubt on this rationale, either by demonstrating that the

15  municipality's evidence does not support its rationale, or by furnishing evidence that

16  disputes the municipality's factual findings." *Id.* at 438-39.  Such evidence must be

17  "actual and convincing." *Fantasyland Video*, 505 F.3d at 1001 (quoting *Alameda Books*,

18  535 U.S. at 438-39 (plurality)).  If a plaintiff succeeds in casting doubt on a

19  municipality's rationale, the burden shifts back to the municipality to supplement the

20  record with evidence renewing support for a theory that justifies its ordinance. *Alameda

21  Books*, 535 U.S. at 438-39 (plurality); *World Wide Video of Wash.*, 368 F.3d at 1195.

22

The County identified the following secondary effects that the ordinance was targeted to reduce: increased crime, decreased property values, neighborhood blight, and the exposure of minors to adult entertainment. (Comm. Rep. at 3, 9-11.) It is beyond dispute that a government's interest in curbing such secondary effects is substantial. *See Maricopa Cnty.*, 336 F.3d at 1166 ("It is beyond peradventure at this point in the development of the doctrine that a state's interest in curbing the secondary effects associated with adult entertainment establishments is substantial."). Additionally, Mr. McKibben concedes that the County relied on sufficient evidence supporting the dispersal requirements as applied to residential zones and other areas where children are likely to congregate, namely "any public or private school, preschool, educational institution, church or other religious facility, public or private park, [or] youth oriented facility." (*See* Mot. at 10 n.26.) As such, the only question before the court is whether, at the legislative stage, the County met its initial burden to connect the dispersal requirement regarding "any establishment serving alcohol by the drink" to the identified secondary effects of increased crime, decreased property values, neighborhood blight, and exposure of minors to adult entertainment.

The court finds that the County met its burden. The County established the Adult Entertainment Zoning Committee to study the community effects of adult entertainment and to recommend proposed zoning ordinances seeking to reduce those effects while ensuring adequate opportunities to operate adult entertainment businesses. (*See* Lubrin Decl. ¶¶ 2-7; Comm. Rep.) The Committee held at least ten meetings; reviewed studies of the secondary effects of adult entertainment, sample ordinances from other

jurisdictions, and federal and state court decisions; heard testimony from law

enforcement officers and community members regarding the effects of adult

entertainment businesses; held a public hearing; and authored a final report proposing

certain regulations of adult businesses.  (*See* Comm. Rep.; Meeting Minutes; 1996

Ordinance; Olson Decl. Ex. 17 (transcript of Council proceedings).)

In 1996, the Council adopted the Committee's recommended regulations.  (*See*

1996 Ordinance.)  With respect to the dispersion requirement, the Committee's report

states:

> In addition, the Committee heard testimony from law enforcement officers regarding the problems associated with the combination of adult entertainment uses and alcohol. Two primary issues were identified. The first was that alcohol and adult entertainment do not mix well. The potential for disruptive, dangerous, and/or illegal behavior is increased when alcohol is involved with adult entertainment. In Washington State adult entertainment facilities do not serve alcohol, and the Committee was concerned to keep separation between alcohol and adult entertainment uses. In particular the Committee was concerned regarding the movement of patrons between taverns, bars, and other establishments that sell alcohol and adult entertainment uses.

(Comm. Rep. at 13.)

The Committee's report continues:

> This movement was related to the second issue.  Law enforcement officers indicated that problems had been experienced when patrons and employees of adult entertainment establishments went to nearby places that served alcohol.  Restaurants with a largely family orientation felt their business was hurt when this occurred, especially when solicitation for acts of prostitution took place.  This concern matched the focus of the Committee on protecting families and children from exposure to adult entertainment. For these reasons the Committee recommended that buffers listed above also be applied to any establishment selling alcohol.

(*Id.*)

David Gossett, the legislative analyst who drafted the initial version of the report, testifies:

> Businesses wanted to stop the flow of customers between the restaurants and the clubs in both directions.  In other words, to stop people from getting drunk and going to the clubs, and to stop customers and employees (including exotic dancers) from leaving the clubs and going to the restaurants.

(Gosset Decl. (Dkt. # 24) ¶ 4 (emphasis omitted).)  He also testifies that "the [C]ommittee had been told, frankly, by representatives of law enforcement that alcohol tended to create additional legal problems with live adult entertainment."  (2d Olson Decl. (Dkt. # 32) Ex. 6 ("Gosset Dep.") at 45:5-9.)

In addition to testimonial evidence, the Committee relied on the regulations and report of the nearby City of Everett.  (Gosset Decl. ¶ 7; Olson Decl. Ex. 10 (list of ordinances on which the Committee relied); Ex. 11 ("Everett Code") at 45).)  The Everett zoning code requires adult use businesses to be set back 500 feet from "any existing establishment selling alcoholic beverages for consumption on premises."  (Everett Code at 45.)  The Everett report summarized testimony by Sergeant John Stewart:  "Most illegal activity related to live adult entertainment establishments have [sic] involved persons who have been intoxicated."  (Everet Rep. Excerpts (Dkt. # 24-2).)  The Everett report also summarized testimony by Sergeant Joe Beline:  "Increased street prostitution occurs in the vicinity of live adult entertainment businesses."  (*Id.*)

Testimony by local law enforcement officers and business owners, as well as the report and ordinance of a nearby jurisdiction, all constitute evidence "reasonably believed to be relevant" to problem at hand.  *See Fantasyland Video*, 505 F.3d at 1001; *Alameda*

1  *Books*, 535 U.S. at 438.  This testimony adequately demonstrates a connection between

2  the speech regulated (namely, live adult entertainment near establishments that serve

3  alcohol) and the secondary effects of increased crime rates, decline of property value, and

4  exposure of minors to adult entertainment.  *See Fantasyland Video*, 505 F.3d at 1001;

5  *Alameda Books*, 535 U.S. at 438.  Specifically, the testimony supports the County's

6  concern that service of alcohol at nearby establishments exacerbates the disruptive and

7  illegal behavior associated with live adult entertainment, and, because alcohol cannot be

8  served inside the adult entertainment facility, facilitates the intrusion of adult

9  entertainment employees and customers into family-oriented businesses and otherwise

10  encourages the mingling of adult entertainment employees and customers with vulnerable

11  segments of the population.  (*See* Comm. Rep. at 13.)

12      "The record here is hardly overwhelming, but it does not have to be."  *Maricopa*

13  *Cnty.*, 336 F.3d at 1168 (citing *Alameda Books,* 535 U.S. at 451 (Kennedy, J.,

14  concurring) (stating that "very little evidence is required" to justify a secondary effects

15  ordinance)).  Both the Supreme Court and the Ninth Circuit have upheld ordinances

16  supported by similar evidence.  *See, e.g.*, *World Wide Video of Wash.*, 368 F.3d at 1196

17  (upholding ordinance because the plaintiff failed to rebut public testimony regarding the

18  adverse effects of retail-only adult entertainment stores); *Maricopa Cnty.*, 336 F.3d at

19  1168 (upholding ordinance supported by citizen testimony at public hearings and

20  documentary studies); *Alameda Books*, 535 U.S. at 452 (upholding proposition

21  "supported by a single study and common experience") (Kennedy J., concurring).  As

22  such, the County has carried its initial burden to show that its rationale for the dispersion

1    requirement from establishments that serve alcohol is "fairly supported." *See Alameda*

2    *Books*, 535 U.S. at 438-39 (plurality).

3           The burden then shifts to Mr. McKibben to "cast direct doubt on this rationale,

4    either by demonstrating that the municipality's evidence does not support its rationale, or

5    by furnishing evidence that disputes the municipality's factual findings." *See id*. Mr.

6    McKibben fails to carry this burden. First, Mr. McKibben's reliance on out-of-circuit

7    cases to argue that the County's testimonial evidence is insufficient is misplaced. (*See*

8    Plf. Mot. at 17-19.) The Supreme Court has explicitly rejected the contention that a

9    municipality must come forward with empirical data in support of its rationale. *See*

10   *Alameda Books*, 535 U.S. at 439 (plurality). "To succeed in 'casting doubt' on a city's

11   evidence or rationale, a plaintiff must do more than point to a municipality's lack of

12   empirical evidence, or challenge the methodology of the municipality's evidence."

13   *Alameda Books, Inc. v. City of L.A.*, 631 F.3d 1031, 1042 (9th Cir. 2011) (citing *Gammoh*

14   *v. City of La Habra,* 395 F.3d 1114, 1126–27 (9th Cir. 2005) and *Maricopa Cnty.*, 336

15   F.3d at 1168).

16          Second, Mr. McKibben fails to provide any "actual and convincing" evidence in

17   his favor. *See Fantasyland Video*, 505 F.3d at 1001 (quoting *Alameda Books*, 535 U.S. at

18   438-39 (plurality)). Mr. McKibben contends that the County must not really have

19   considered law enforcement officer testimony because the Committee's meeting minutes

20   do not describe an instance in which a law enforcement officer discussed alcohol in the

21   context of adult entertainment. (*See, e.g.*, Plf. Reply (Dkt. # 36) at 3.) Mr. McKibben's

22   attempt to cast doubt on the Committee's report falls short. The meeting minutes

1   describe at least two times that law enforcement officers addressed the Committee, as

2   well as at least two times that the Committee discussed the alcohol disbursement

3   requirement, and, as such, the minutes are consistent with the findings stated in the

4   report.  (*See* Meeting Minutes at 8, 10-12, 15, 21.)  Moreover, there is no indication that

5   the meeting minutes were intended to be exhaustive:  each hour and a half meeting is

6   summarized in approximately one to three pages of minutes.  (*See generally id.*)  Mr.

7   McKibben provides no explanation or authority showing why the court should find that

8   the informal meeting minutes trump the Committee's official report.

9          Mr. McKibben's argument that there is an inadequate connection between the

10  dispersion requirement and the identified secondary effects because the ordinance does

11  not also include establishments (such as liquor stores) that sell alcohol for private

12  consumption is unavailing.  Municipalities are entitled to a reasonable opportunity to

13  experiment with solutions to address the secondary effects of protected speech.  *See*

14  *Alameda Books*, 535 U.S. at 439 (plurality).  Mr. McKibben's belief that there is a more

15  effective way to address certain identified secondary effects does not render the solution

16  chosen by the County unconstitutional.

17         Finally, Mr. McKibben's argument that there is an inadequate connection between

18  the dispersion requirement and secondary effects because the ordinance includes non-

19  family establishments (such as pubs) falls short.  This over-breadth critique implicates the

20  narrow tailoring requirement.  To meet the narrow tailoring requirement, a time, place, or

21  manner regulation need not be the least restrictive means of serving a municipality's

22  content neutral interests.  *See Fantasyland Video*, 505 F.3d at 1004.  To the contrary, the

narrow tailoring requirement "is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation and the means chosen are not substantially broader than necessary to achieve the government's interest." *Id.* (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 799–800 (1989)). Here, the County's goals of decreasing illegal behavior and the diffusion of adult entertainment workers and clients into nearby community establishments would be achieved less effectively absent the dispersion requirement, and the dispersion requirement is not substantially broader than necessary to achieve these goals. *See United States v. Albertini,* 472 U.S. 675, 689 (1985) (holding that restrictions will not violate the First Amendment "simply because there is some imaginable alternative that might be less burdensome on speech"). As such, the dispersion requirement meets the narrow tailoring requirement.

In sum, the County originally relied on sufficient evidence to support its dispersion requirement and Mr. McKibben has failed to carry his burden to "cast direct doubt" on the County's rationale. *See Alameda Books,* 535 U.S. at 438-39 (plurality). As such, the County's dispersion requirement adequately advances a substantial government interest.

## 2. Reasonable alternative avenues of communication

An ordinance satisfactorily allows alternative avenues of communication as long as "it offers adult businesses a 'reasonable opportunity to open and operate within the city.'" *Lim v. City of Long Beach*, 217 F.3d 1050, 1054 (9th Cir. 2000) (quoting *City of Renton,* 475 U.S. at 54). Courts apply a two-step approach to determining whether this

1   condition is satisfied:  (1) determine the number of sites reasonably available to adult

2   businesses under the regulation at issue, and (2) determine whether that number affords a

3   sufficient number of potential location sites for adult businesses.  *Id.*; *see also Topanga*

4   *Press, Inc. v. City of L.A.*, 989 F.2d 1524, 1530 (9th Cir. 1993).  The burden of proving

5   alternative avenues of communication rests on the municipality.  *Lim*, 217 F.3d at 1054.

6   "What constitutes a reasonable opportunity to open and operate an adult theater is a

7   mixed question of fact and law."  *Young v. City of Simi Valley*, 216 F.3d 807, 817 (9th

8   Cir. 2000); *see also Lim*, 217 F.3d at 1054 ("A mixed question of law and fact exists

9   when there is no dispute as to the facts, the rule of law is undisputed, and the question is

10  whether the facts satisfy the legal rule.")

11          **a.  Alternative sites available**

12          With respect to the first step, the initial burden falls on the municipality to provide

13  a good faith and reasonable list of potentially available property.  *See id.*; *Isbell v. City of*

14  *San Diego*, 258 F.3d 1108, 1114 (9th Cir. 2001).  Upon such a showing, the burden shifts

15  to the plaintiff to show that particular sites would in fact not reasonably become

16  available.  *Lim*, 217 F.3d at 1054.  For sites to be available, they must be in the "actual

17  business real estate market."  *Isbell*, 258 F.3d at 1114 (quoting *Lim,* 217 F.3d at 1055).  It

18  is irrelevant, however, whether a given site "will result in lost profits, higher overhead

19  costs, or even prove to be commercially infeasible for an adult business."  *Id.* (citing

20  *Topanga Press,* 989 F.2d at 1531).  Rather, "[t]he issue is whether any site is part of an

21  actual market for commercial enterprises generally."  *Topanga Press,* 989 F.2d at 1531;

22  *see also City of Renton*, 475 U.S. at 54.

1    The following considerations are relevant to determining whether a site is part of

2    the relevant market for commercial enterprises.  First, available sites must satisfy the

3    zoning restrictions at issue.  *Isbell,* 258 F.3d at 1113.  Beyond that, sites that are

4    commercially zoned are automatically part of the relevant market.  *Topanga Press,* 989

5    F.2d at 1531.  The mere fact that a municipality has restricted adult entertainment venues

6    to industrial zones does not render the sites unavailable under *City of Renton*.  *See Tollis*,

7    505 F.3d at 942 ("If an industrial site is reasonably accessible and has sufficient

8    infrastructure to be 'available' under *Topanga,* it remains available even if its use for

9    other commercial purposes may be restricted by the zoning law.")  Sites located in

10   industrial or manufacturing zones, however, must be "reasonably accessible to the

11   general public," have "proper infrastructure," and must be suitable for "some generic

12   commercial enterprise, although not [necessarily] every commercial enterprise."  *Tollis*,

13   505 F.3d at 941 (quoting *Topanga Press,* 989 F.2d at 1531).  Furthermore, sites for which

14   it is "unreasonable to believe that [they] would ever become available to any commercial

15   enterprise" are not part of the market.  *Topanga Press,* 989 F.2d at 1531.

16       Here, the parties agree that a total of 301 parcels in unincorporated Snohomish

17   County meet the zoning requirements for an adult cabaret—namely, the parcels are zoned

18   for light industrial, heavy industrial, or industrial park use, and some or all of each parcel

19   is set outside the dispersion zone. [2]  (*See* Garrelts Rep. (Dkt. # 29-1) at 3; Fear Rep. (Dkt.

20   # 25-1) at 2.)  Of those 301 parcels, the County's expert identifies 104 parcels that in his

21

22       [2] The dispersion requirement is measured from the corner of an adult entertainment building to the nearest border of the parcel it must be separated from.  *See* SCC § 30.28.015(2).

ORDER- 17

1   opinion are part of the actual business real estate market.  (*See* Fear Rep. Ex. B ("Fear

2   Sprdsht.").)  Because this list contains pertinent and specific information about each

3   parcel and excludes obviously inappropriate parcels such as landfills, state parks, and

4   United States Department of Navy government facilities, the court finds that this list is a

5   good faith and reasonable list of potentially available property.  *See Lim*, 217 F.3d at

6   1054; *Isbell*, 258 F.3d at 1114.  As such, the burden shifts to Mr. McKibben to show that

7   particular sites are in fact not reasonably available.  *Id.*

8        Mr. McKibben's expert concedes for the purposes of this motion that 16 parcels

9   are reasonably available, but identifies 88 parcels that in his opinion are not reasonably

10   available.  (*See* Garrelts Rep.; Garrelts Sprdsht.[3])  The expert groups these parcels

11   according to the reasons he believes they are unavailable.  The court addresses each

12   group of parcels in turn.  *See Fantasyland Video, Inc. v. Cnty. of San Diego*, 373 F. Supp.

13   2d 1094, 1143 (S.D. Cal. 2005) (addressing disputed parcels one by one) *aff'd in part,*

14   *rev'd in unrelated part and remanded sub nom. Tollis, Inc. v. Cnty. of San Diego*, 505

15   F.3d 935 (9th Cir. 2007) and *aff'd*, 505 F.3d 996 (9th Cir. 2007).

16              **i.   Parcels with only a portion of property outside the dispersal area**

17        Mr. McKibben argues that parcels ## 1, 3-6, 8, 10-16, and 22-24 are not part of

18   the relevant commercial real estate market because the portion of the property located

19   outside the dispersal area consists of inadequate space to locate a cabaret while meeting

20   requirements for setback, parking, and landscaping.  (Garrelts Sprdsht. at 1; 2d Garrelts

---

21
22       [3] This exhibit was provided to the clerk's office in hardcopy form and, as such, is not listed on the docket.

1    Decl. (Dkt. # 31) ¶ 4.)  Mr. Garrelts testifies that, in his experience, the "minimum size"

2    for an adult cabaret is 2400 square feet.  (2d. Garrelts Decl. ¶ 3.)  Be that as it may, the

3    relevant inquiry is not whether a location suits the particular needs of adult cabarets, but

4    rather whether the location is suitable for some commercial business.  *See Topanga*

5    *Press*, 989 F.2d at 1531 ("While it is constitutionally irrelevant whether relocation sites

6    located in industrial or manufacturing zones suit the *particular* needs of an adult

7    business, potential sites must be reasonable relocation sites for some commercial

8    enterprise before they can be considered part of the relevant market."); *see also Tollis*,

9    505 F.3d at 941 (stating that available property must be suitable for "some generic

10   commercial enterprise, although not [necessarily] every commercial enterprise").  The

11   County's expert demonstrates how a sizeable building can be erected on each of parcels 1

12   and 3-6.  (*See* Fear Rep. at 4-5, Exs. B, C (maps showing possible placement of buildings

13   on parcels)).  Mr. McKibben does not argue that such buildings are inadequate for other

14   commercial enterprises besides a cabaret, such as, for example, a coffee shop.

15   Consequently, he has failed to carry his burden to show that these parcels are not a part of

16   the relevant market.

17        With respect to the remaining parcels, Mr. McKibben contends that, due to

18   existing structures, only a "sliver of land" for a new cabaret building is available.  (Plf.

19   Resp. (Dkt. # 30) at 5.)  The County points out that the existing structures can be

20   removed and that as a result the parcels would then contain ample room for parking and a

21   commercial business.  (Fear Sprdsht at 1.)  Mr. McKibben provides no authority to

22   support the position that property is excluded from the commercial market if it contains

1   existing structures that are unsuitable for use as a cabaret.  (*See* Plf. Resp. at 5-6.)  There

2   may be a cost associated with removing existing structures, but it is well-established that

3   "possible economic impact upon a business is not a factor to be considered by the courts

4   when determining whether a city has provided a business with a reasonable alternate

5   location."  *Topanga Press*, 989 F.2d at 1529.  When determining whether a site is part of

6   the relevant market, "it is not relevant whether [the] site will result in lost profits, higher

7   overhead costs, or even prove to be commercially infeasible for an adult business."  *Id.*

8   at 1531.  The only issue "is whether any site is part of an actual market for commercial

9   enterprises generally."  *Id.*

10         Mr. McKibben has provided no evidence that the properties are unsuitable for

11   commercial enterprises generally.  *See Tollis*, 505 F.3d at 941.  As such, he has not

12   carried his burden to show that the majority of these properties are not a part of the

13   relevant real estate market.  The sole exception is parcel # 15:  there is at least a question

14   of fact as to whether the County's proffered solution of adjusting the property line would

15   transform that property into a reasonable alternative.  *See Levi v. City of Ontario*, 44 F.

16   Supp. 2d 1042, 1050 (C.D. Cal. 1999) (holding that the possibility of subdivision to

17   satisfy zoning requirements did not render a site part of the relevant market).

18                    **ii.  Parcels with restrictions on commercial use**

19         Mr. McKibben argues that parcels ## 9 and 18 should be excluded from the

20   market because they are encumbered with contractual restrictions on commercial use.

21   (Garrelts Sprdsht. at 1.)  First, there is evidence that parcel # 18 is only accessible via an

22   easement that is limited to residential use.  (2d. Garrelts Decl. Ex. 4 (easement).)  Second,

ORDER- 20

parcel # 9 is subject to an open space taxation agreement that limits the commercial

development of the land.  (Garrelts Decl. Ex. 3 (open space agreement).)  The agreement

remains in force for at least 3 more years and can last indefinitely if the owner does not

withdraw.  (*Id.*)  The court finds that Mr. McKibben has raised a question of fact

regarding the commercial availability of all these two parcels.

### iii. Parcels lacking infrastructure

Mr. McKibben argues that parcels ## 26-28 are not a part of the relevant

commercial market because they lack appropriate infrastructure and because parcel # 28

is landlocked.  The Ninth Circuit has explained that examples of necessary infrastructure

may include "sidewalks, roads and lighting."  *Topanga Press*, 989 F.2d at 1531.

Additionally, landlocked sites are generally not considered available because they are not

reasonably accessible to the general public.  *See Fantasyland Video*, 373 F. Supp. 2d at

1138 (citing *Isbell,* 258 F.3d at 1113; *Lim,* 217 F.3d at 1055).  Merely asserting that sites

lack proper infrastructure, however, is insufficient; a plaintiff must show that such sites

are unusable for any generic commercial enterprise.  *Diamond v. City of Taft*, 215 F.3d

1052, 1056 (9th Cir. 2000).  Here, Mr. McKibben states that the parcels lack access to

water, sewer, lighting, and sidewalks, and are located over 1000 feet from power and

roads.  (Garrelts Rep. at 11; Garretls Sprdsht at 1.)  The County admits that the parcels

are designated as "forestland," *see generally* RCW ch. 84.33, and are not in the vicinity

of sidewalks or streetlights.  (Def. Resp. (Dkt. # 23) at 16.)  The County nonetheless

maintains that the "rural character" of Snohomish County often requires business

ventures to install new infrastructure.  *Id.*  The County's expert recalls one business

ORDER- 21

1   owner, in particular, "who was undeterred by the lack of a sewer and arranged for sewage

2   to be stored on site and removed regularly."  (Fears Rep. at 5.)

3         The County presents no other evidence regarding the feasibility of such endeavors,

4   and its position that business ventures are "often" required to install new infrastructure is

5   belied by the fact that only 3 of the 301 industrial parcels identified for this case lack

6   infrastructure.  (*See* Fears Sprdsht.)  Moreover, in arguing that parcel # 28 is not

7   landlocked, the County mistakes an abandoned railroad converted into a trail for a road.

8   (*See* 2d. Garrelts Decl. ¶ 6, Ex. 5.)  The court finds Mr. McKibben has at least raised a

9   question of fact regarding the suitability of these parcels for the general commercial real

10   estate market.  *See Fanstasyland Video*, 373 F. Supp. 2d at 1136 ("While neither side

11   presented sufficient evidence to prevail on their respective cross-motions, the Court finds

12   each side presented sufficient evidence to successfully oppose the other's summary

13   judgment motion. Accordingly, a disputed issue of fact remains whether one site in Area

14   2 . . . could be developed.").

15                **iv. Parcels near or under water**

16         Mr. McKibben argues that parcels ## 30-32 are unsuited for any generic

17   commercial enterprise because they are swamps or tidelands.  (*See* Fears Sprdsht. at 2.)

18   The County responds that these parcels are "very usable" because they not in a flood

19   plain.  (*Id.*)  Mr. McKibben's rejoinder is that these parcels are unsuitable because they

20   have been developed as pulp mills, used for logging, or contain sloughs for the transport

21   of logs.  (*Id.*)  The Ninth Circuit has stated that examples of sites unsuited for any generic

22   commercial enterprise include swamps and land under the ocean.  *See Topanga Press*,

ORDER- 22

1    989 F.2d at1531.  Accordingly, the court finds that Mr. McKibben has raised an issue of

2    fact regarding the reasonable availability of these three parcels.

3                          **v.  Parcels on airport land**

4         Mr. McKibben argues that every parcel located at Paine Field, also known as

5    Snohomish County Airport, should be excluded from the market.  (Garrelts Sprdsht. at 3-

6    8; Plf. Resp. at 7.)  The County agrees that runways, taxiways, and locations immediately

7    adjacent thereto should be excluded because they are reserved by the Federal Aviation

8    Administration for aviation uses only.[4]  (Def. Resp. at 9; Fear Rep. at 6.)  The property at

9    Paine Field, however, also includes office parks and buildings that are available for lease

10   by non-aviation businesses.  (Fear Rep. at 6.)  For example, the current airport tenant list

11   includes non-aviation businesses such as a mini-blind store, a lighting design company, a

12   hotel, a machine shop, and a rental management company.  (Fears Rep. at 6, Ex. D

13   (airport tenant list).)  Additionally, the property at Paine Field includes vacant parcels

14   that the "Airport Master Plan" designates for "airport compatible industrial

15   development."  (*See, e.g.*, Fears Sprdsht. at 5.)

16        In general, any commercial venture must obtain permission from the airport

17   director in order to locate in Paine Field.[5]  (2d. Olson Decl. (Dkt. # 35) Ex. 2 ("Dolan

18   Dep.") at 19:1-20:11.)  The airport director, who is a County employee, has the discretion

19

20        [4] Consequently, only the following parcels at Paine Field are disputed:  91, 94-97, 99-101, 103-
     105, 108-110, 112, 115-118, 152, 153, 156, 162-169, 173-175, 191-194, 220, 229, 240, 241, 247-251,
     254, 264-266.  (*See* Fears Sprdsht. at 3-7.)

21

22        [5] Snohomish County Code 15.08.400 requires consent from the airport manager before beginning
     commercial operations at the airport.  *See* SCC § 15.08.400.  This requirement is perpetuated in a lease
     clause that requires airport consent for subleases.  (*See* Dolan Dep. at 19:1-20:11.)

1   and authority to decide whether to allow a business to site in the airport.  (*Id.*)  The

2   airport director usually collaborates with airport staff members when making siting

3   decisions; they consider the Airport Master Plan and the County's "vision for how areas

4   will develop."  (*Id.* at 8:10-9:3.)  In general, the Snohomish County Code provides that

5   the airport may deny lease applications for the following reasons:  (1) proposed uses that

6   are incompatible with the airport master plan, area zoning or federal restrictions incurred

7   with grants; (2) airport safety concerns; (3) unavailability of space; (4) budget

8   constraints; or (5) ecological considerations.  *See* SCC § 15.08.420-25.  The deputy

9   airport director testified that he does not "have a strong feeling . . . one way or the other"

10  as to whether a cabaret would ultimately be permitted at Paine Field, but noted that a

11  restaurant and lounge had operated at the airport for many years.  (Dolan Dep. at 20:12-

12  21:22.)  As an example of a lease application that might be rejected, the airport deputy

13  director referenced an application for a marijuana growing operation that would conflict

14  with federal law and Federal Aviation Agency regulations.  (*Id.* at 18:16-25.)

15      Mr. McKibben does not dispute that some Paine Field property is available for

16  lease by general commercial businesses.  (*See* Plf. Resp. at 7.)  Instead, he contends that

17  even these areas must be excluded from the market because the airport director is vested

18  with discretion to decide which lease applications to grant and, as such, "you cannot

19  locate an adult cabaret there as a matter of right."  (*Id.*)  This argument is not viable.

20      The relevant marketplace is not limited to property in which an adult cabaret is

21  guaranteed location "as a matter of right."  After all, most if not all property owners

22  maintain some amount of discretion regarding which businesses they choose to lease to.

1    Here, there is no indication that the airport director would categorically exclude adult

2    entertainment businesses.  But even if there were, the Ninth Circuit has made clear that

3    parcels that prohibit leases to adult entertainment venues are considered part of the

4    relevant market so long as they are available to commercial businesses generally.  *See*

5    *Lim,* 217 F.3d at 1055.  Consequently, the mere fact that every commercial business

6    seeking to operate at Paine Field does so subject to the airport manager's discretion does

7    not, without more, remove Paine Field property from the general business real estate

8    market. [6]  *See City of Renton*, 475 U.S. at 54 ("That respondents must fend for themselves

9

10

---

11    [6] Mr. McKibben also appears to contend that the airport director's discretion to approve lease applications constitutes a prior restraint on free speech.  Mr. McKibben, however, is not entitled to bring a facial challenge to this policy.  Although facial challenges may lie where a law gives a government official substantial power to discriminate based on the content of speech, "[t]his is not to say that the press or a speaker may challenge as censorship any law involving discretion to which it is subject."  *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 759 (1988).  Rather, "[t]he law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks."  *Id.*  Accordingly, in the Ninth Circuit, "a facial challenge is proper only if the statute by its terms seeks to regulate spoken words or patently expressive or communicative conduct, such as picketing or handbilling, . . . or if the statute significantly restricts opportunities for expression."  *S. Or. Barter Fair v. Jackson Cnty.*, 372 F.3d 1128, 1135 (9th Cir. 2004) (citations omitted)); *see also Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1032 (9th Cir. 2006) (holding that a facial challenge to an ordinance regarding distribution of food in city parks was not available).  The Supreme Court has identified building permits as an example of "laws of general application that are not aimed at conduct commonly associated with expression" and therefore "carry with them little danger of censorship."  *City of Lakewood*, 486 U.S. at 760-61.  Although occasional opportunities for censorship via building permit exist, the permitting system provides "too blunt a censorship instrument to warrant judicial intervention prior to an allegation of actual misuse."  *Id.*
    Here, the County's policy regarding airport lease applications does not seek to regulate spoken words or patently communicative conduct.  *See S. Or. Barter Fair*, 372 F.3d at 1135.  Rather, it is a law of general application that is aimed at conduct not commonly associated with expression—namely, the conduct of obtaining commercial leases of retail space.  *See City of Lakewood*, 486 U.S. 760.  Although, as with building permits, occasional opportunities for censorship may exist, these situations are better addressed in the context of actual allegations of misuse.  *See id.* at 761.  Mr. McKibben raises no allegations of actual misuse, and otherwise puts forth no evidence showing that the discretionary leasing policy is being unconstitutionally applied to adult entertainment venues.  As such, his prior restraint challenge fails.

1    in the real estate market, on an equal footing with other prospective purchasers and

2    lessees, does not give rise to a First Amendment violation.").

3      To the extent that parcels at Paine Field are not limited to aviation use or aviation-

4    related businesses, the court finds that Mr. McKibben fails to show that these parcels are

5    not a part of the relevant real estate market.  The one exception is parcel # 191, which is

6    apparently slated for "aviation use development w/ taxi access."  (*See* Fears Sprdsht. at

7    6.)  Due to testimony that parcels with access to taxiways are typically reserved for

8    aviation businesses, as well as the fact that the County concedes that all other parcels

9    labeled "aviation use development w/ taxi access" are outside the relevant real estate

10   market, the court finds that a question of fact exists as to the status of this parcel.  (*See*

11   *id.*; Fears Rep. at 6.)

12       **vi. Parcels unsuitable for generic commercial enterprises**

13     Mr. McKibben argues that parcels ## 240, 241, 247-251, 254, and 264-266 have

14   been developed in a way that is incompatible with any generic commercial enterprise.

15   (Garrelts Sprdsht at 9-10.)  These parcels include gravel pits, recycling sites, and large

16   warehouses, and some of the parcels are landlocked.  (*Id.*)  The County argues that these

17   sites are not "totally incompatible" with a generic commercial business because they

18   could be renovated by demolishing existing buildings or subdividing the property.  (Def.

19   Resp. at 10.)  The Ninth Circuit, however, has stated that examples of sites unsuited for

20   generic commercial enterprise include warehouses, sewage treatment plants, and sports

21   stadiums.  *Topanga Press*, 989 F.2d at 1531.  Additionally, the possibility of subdividing

22   does not necessarily transform an unacceptable site into a reasonable alternative.  *See*

1   *Levi*, 44 F. Supp. 2d at 1050.  The problem with the County's argument is that, although

2   it is of course theoretically possible to demolish a sport stadium or a large warehouse in

3   order to develop a cabaret, the cost of doing so may be so prohibitive as to make the

4   proposition unrealistic.  *See Topanga Press,* 989 F.2d at 1530; *see also Lim*, 217 F.3d at

5   1055 ("[S]ingle-use buildings, like warehouses and factories, may arguably be outside

6   commercial real estate market.") (quoting *Woodall v. City of El Paso,* 49 F.3d 1120,

7   1125-26 (5th Cir. 1995)).  Mr. McKibben has at least raised an issue of fact as to whether

8   it is reasonable to believe these 11 parcels "would ever become available to any

9   commercial enterprise."  *See id.* at 1531.

10                          **vii.  Parcels with long-term commitments**

11          Finally, Mr. McKibben argues that parcels ## 267, 268, and 270-281 are not part

12   of the relevant commercial market because they are subject to long term leases, in

13   receivership, or not currently for sale by their owner.  (Garrelts Sprdsht. at 9.)  *City of*

14   *Renton* only requires a site to be potentially—rather than actually—available.  *See City of*

15   *Renton*, 475 U.S. at 53.  As such, the mere fact that a site is currently occupied or not

16   currently for sale or lease does not render it unavailable.  *See id.* at 53-54; *Diamond,* 215

17   F.3d at 1056 ("Despite the current unavailability of these sites, [the plaintiff] did not offer

18   sufficient evidence to show that these sites would not reasonably become available to any

19   commercial enterprise.").  Nonetheless, the requirement of potentiality connotes "genuine

20   possibility."  *See Topanga Press*, 989 F.2d at 1531.  Accordingly, long term leases may

21   exclude sites from the commercial market.  *Lim,* 217 F.3d at 1055.  A plaintiff must,

22   however, provide evidence regarding the length of an allegedly "long term" lease.

1  *Isbell*, 258 F.3d at 1113 (rejecting expert opinion that did not specify the length of the

2  leases in question).

3         Here, Mr. McKibben presents evidence showing that the leases on parcels ## 268,

4  270, and 272 run for the next 14, 7, and 11 years, respectively.  (Garrelts Sprdsht. at 9;

5  2d. Garrelts Decl. ¶ 8.)  As such, these properties are not available within the meaning of

6  *City of Renton*.  *See Lim,* 217 F.3d at 1055.  With respect to parcels ## 271, 273, 277-

7  279, Mr. McKibben avers that there is a "long-term lease" in place for each but provides

8  no evidence as to the length of those leases.  (*See* Garrelts Sprdsht. at 9.)  As such, under

9  *Isbell*, Mr. McKibben fails to show these parcels are unavailable.  *See Isbell*, 258 F.3d at

10  1113.  The same holds true for parcels ## 267 and 281, because although the owners

11  informed Mr. McKibben's expert that the property was currently not for sale, there is no

12  indication regarding how far into the future their intentions not to sell extend, and current

13  occupancy alone is not grounds for unavailability under *City of Renton*.  *See City of*

14  *Renton,* 475 U.S. at 53-54; *Diamond,* 215 F.3d at 1056; (*see also* Garrelts Sprdsht. at 9;

15  2d. Garrelts Decl. ¶ 8.)  Last, Mr. McKibben excludes parcels ## 274 through 276

16  because they are in receivership and a sale is pending.  (Garrelts Sprdsth. at 9.)  These

17  properties contain multiple commercial spaces, and Mr. McKibben provides no reason to

18  believe those spaces will not be available for lease or purchase from the new owners.  For

19  these reasons, the court finds that Mr. McKibben has shown only that parcels ## 268,

20  270, and 272 are unavailable due to long-term leases.

21

22

ORDER- 28

1

### viii.   Summary

2       In sum, Mr. McKibben has shown that 3 of the County's identified 104 properties

3 are not part of the relevant commercial market and has raised questions of fact for 21

4 other properties.[7]  For the purposes of evaluating the sufficiency of the available sites, the

5 court will take all inferences in Mr. McKibben's favor.  *See A.C.L.U. of Nevada*, 466

6 F.3d at 790-91.  Accordingly, the court will judge the sufficiency of the sites on the

7 assumption that the County's ordinance provides only 80 locations for adult cabarets.

8

### b.  Sufficiency of available sites

9        "There is no constitutional requirement that a city make available a certain

10 number of sites."  *Diamond v. City of Taft*, 215 F.3d at 1056-57.  Instead, to determine

11 whether the potentially available sites provide an adult business a "reasonable

12 opportunity to open and operate" in a particular municipality, a court must "perform a

13 fact-specific inquiry" that takes into account the "particular characteristics of [the

14 municipality], including its size and make-up."  *Young*, 216 F.3d at 821.  Supply and

15 demand is one factor that a court should consider.  *Id.*; *Tollis*, 505 F.3d at 942.  Other

16 factors include "the percentage of available acreage theoretically available to adult

17 businesses, the number of sites potentially available in relation to the population,

18 community needs, the incidence of adult businesses in other comparable communities,

19 and the goals of the city plan."  *Young*, 216 F.3d at 821.  No one factor is dispositive.  *Id.*

20 at 822.

21

22      [7] Specifically, Mr. McKibben has shown that parcels ## 268, 270, and 272 are unavailable, and
that there are questions of fact regarding parcels ## 9, 15, 18, 26-28, 30-32, 191, 240, 241, 247-251, 254,
264-266.

### i.   Percentage of available acreage

Starting with the percentage of available acreage, the total acreage of the 80 available locations is 336 acres.[8]   The parties disagree, however, whether the relevant comparison is between the available sites and the total acreage of the unincorporated area, or the total acreage that would potentially be available to adult entertainment businesses if it were not for the zoning ordinance.  Specifically, Mr. McKibben maintains that the relevant comparison is to the "total usable land" area in unincorporated Snohomish County, which he calculates as the total land area minus incorporated cities, county and federal forest lands, and the Tulalip Indian Reservation.  (Garrelts Rep. at 9.) The "total usable land" is therefore 307,528.6 acres.  (*Id.*)  For its part, the County maintains that the denominator should be the "total commercial land" area in unincorporated Snohomish County, which it calculates as the sum of the properties with "Urban Industrial" and "Urban Commercial" designations under the Snohomish County 2025 Comprehensive Plan.  (Fear Rep. at 5.)  These designations include land zoned for a variety of uses, such as neighborhood business, general commercial, business park, and light and heavy industry, but exclude residential, rural, and agricultural land, among

---

[8] Mr. McKibben argues that court should use the "total buildable acreage" rather than the total acreage of these properties.  (Plf. Resp. at 2-3.)  Mr. McKibben appears to have arrived at the concept of "total buildable acreage" by observing the column on the County's expert's spreadsheet that calculated, for some parcels of land, the amount of land that was available for new construction.  (*See* Fears. Sprdsht.)  This value, however, was not calculated for all parcels of land—for example, the value is irrelevant to parcels with existing buildings for lease.  Moreover, Mr. McKibben cites no authority for his assertion that the acreage of available land should be limited to the footprints of the new buildings that could be built on the land.  As such, the court will use the total acreage of the parcels in the general commercial real estate market.

ORDER- 30

1   others.  (*See* County Plan (Dkt. # 34-3).)  The "total commercial land" is 4,787 acres.

2   (Fear Rep. at 5.)

3        Whereas *Young* states the pertinent factor is "the percentage of available acreage

4   theoretically available to adult businesses," it does not specify what areas of land the

5   percentage should compare.  *See* 216 F.3d at 822.  In *Walnut Properties* and *City of*

6   *Renton*, the courts relied on the acreage of the entire municipality.  *See Walnut*

7   *Properties*, 861 F.2d at 1108; *City of Renton,* 475 U.S. at 53.  Neither court, however,

8   discussed its choice of denominator or addressed the issue currently before the court.

9   Ultimately, the purpose of the comparison is to determine whether adult entertainment

10  stores have a "reasonable opportunity to open and operate" in a given municipality.  *See*

11  *Young*, 216 F.3d at 821.  The focal point of this inquiry is the effect that the

12  municipality's ordinance has on the "actual business real estate market" in which generic

13  commercial enterprises actually operate.  *See Isbell,* 258 F.3d at 1112-13; *Topanga*

14  *Press,* 989 F.2d at 1531.  It seems to the court that, in order to accurately gauge this

15  effect, the comparison should not include areas which would ordinarily not be available

16  to a generic business enterprise regardless of the municipality's adult entertainment

17  ordinance.  *See Fantasyland Video*, 373 F. Supp. 2d at 1142 (using only the total

18  industrially and commercially zoned acreage to calculate the percentage of available

19  property in an unincorporated county).  This exclusion is especially apt in the context of a

20  largely undeveloped and rural unincorporated county such as Snohomish.  Accordingly,

21  in this case, the relevant comparison is between the acreage of the available adult

22  entertainment sites and the total industrial and commercial districts.  Based on this

ORDER- 31

1  comparison, adult entertainment businesses have access to 7% of the total industrial and

2  commercial acreage.  This percentage is greater than the availability of 4.46% of

3  commercial and industrial acreage that was held constitutional in *Fantasyland Video*, and

4  was upheld by the Ninth Circuit in *Tollis*.[9]  *See Fantasyland Video*, 373 F. Supp. 2d at

5  1142-3; *Tollis*, 505 F.3d at 942.

6  ### ii.  Population needs

7  Next, the court considers "the number of sites potentially available in relation to

8  the population [and] the incidence of adult businesses in other comparable communities."

9  *Young*, 216 F.3d at 821.  Unincorporated Snohomish County had a population of 304,435

10  in 2013, which results in one adult entertainment location for every 3,805 persons.  (*See*

11  2013 Annual Rep.)  In *Fantasyland*, the court upheld a zoning ordinance in an

12  unincorporated county that resulted in one potential adult entertainment location for

13

14  _____

15  [9] If the "total usable land" were considered, the percent would drop to 0.11%, which is lower than
the amounts approved in *City of Renton* and *Walnut Properties*.  *See City of Renton*, 465 U.S. at 53
(upholding an ordinance that left 520 acres and 5 % of land available); *Walnut Properties*, 808 F.3d at
16  1337 (striking down ordinance that left 99.5 acres and 1.4% of land available).  As Mr. McKibben
concedes, there is no "bright line" rule governing the appropriate percentage of available land.  (*See* Plf.
17  Reply (Dkt. # 36) at 7.)  In *Tollis*, the Ninth Circuit upheld zoning laws that reserved only 0.01% of total
land available.  *See Tollis*, 505 F.3d at 942 (affirming in relevant part *Fantasyland Video*, 373 F. Supp.
18  2d at 1142 (finding 227.03 acres were available out of a total 2,286,059 acres)).  The Ninth Circuit was
not persuaded by the plaintiff's argument that "the percentage of available acreage theoretically available
to adult businesses in unincorporated San Diego County is drastically less than the amount approved in
19  *Renton*" because the plaintiff "offers[ed] no argument or evidence showing that these communities are
comparable to unincorporated San Diego County in size, population, or demographics."  *Id.*  The Ninth
20  Circuit ruled that, "[a]bsent such a connection, [the plaintiff's] calculations are meaningless."  *See id.*
Here, Mr. McKibben has compiled out of district cases discussing similarly low percentages of available
21  acreage, but presents no argument or evidence showing that the underlying communities are comparable
to unincorporated Snohomish County.  (*See* Plf. Mot. at 9-14.)  In fact, Snohomish County, like the
county at issue in *Tollis*, is a large, unincorporated county with substantial amounts of rural and
22  undeveloped land.  (*See* 2013 Annual Rep.).  As such, *Tollis*, rather than Mr. McKibben's case, would
control.

1    every 6911 persons—a ratio twice as high.[10]  *See Fantasyland*, 373 F. Supp. 2d at 1142-

2    43.  In review, the Ninth Circuit noted:  "The unincorporated portions of the county take

3    up the substantial majority of the land area but only a small fraction of the population of

4    the county as a whole.  It may fairly be presumed that most of the commercial property in

5    the county, including property suitable for adult businesses, is located within municipal

6    boundaries and thus outside the territory governed by the ordinance in question."  *Tollis*,

7    505 F.3d at 942.  As such, "at least where we are dealing with 'unincorporated' areas, it

8    is appropriate to recognize the likely availability of other locations within the same

9    economic market in neighboring municipalities."  *Id.*  Here, as in *Tollis*, unincorporated

10   Snohomish County comprises over 90% of the land area but less than half the population

11   of Snohomish County.  (*See* Garrelts Rep. at 9 (incorporated land statistics); 2013 Annual

12   Rep. (population statistics).)  As such, when considering the number of sites available in

13   relation to the population, it is appropriate to recognize the likely availability of other

14   locations within the same economic market in neighboring municipalities.  *See Tollis*,

15   505 F.3d at 942.

16              **iii. Supply and demand**

17         "[M]easuring whether the number of proposed sites is sufficient to meet existing

18   demand for sexual or pornographic speech is one of several tools to assess whether a

19   municipality has afforded an adult business a reasonable opportunity to conduct their

20   trade."  *Tollis*, 505 F.3d at 942.  After all, "data regarding the number of sites available

21   _____

22        [10] In fact, in *Fantasyland*, only 8-10 adult entertainment locations could operate simultaneously,
     so a maximum ratio of operating adult entertainment venues to population could not exceed 1 for 47,000
     persons.  *See Fantasyland*, 373 F. Supp. 2d at 1142-43.

1  for adult use is meaningless without a contextual basis for determining whether that

2  number is sufficient for that particular locale." *Young*, 216 F.3d at 822.

3        Here, it is undisputed that only one adult entertainment dance studio has operated

4  in unincorporated Snohomish County within the past 30 years. (Lubrin Decl. ¶ 8.)

5  Namely, the venue "Honey's" operated from 1994 until it was closed in 2012.  (*Id.*)  It is

6  also undisputed that, since the zoning ordinances were enacted in 1994, Snohomish

7  County has received only two applications for adult cabarets, both of which occurred in

8  2011.  (*Id.* ¶ 8, Ex. B, Ex. C.)  Drawing all inferences in Mr. McKibben's favor, it

9  appears that there has been demand to operate at most three adult cabarets in the County

10  at one time.[11]

11        In *Young*, the Ninth Circuit found that a city ordinance that provided four possible

12  simultaneous sites for adult entertainment businesses was constitutional because only one

13  person had ever applied for an adult business permit and "there was no evidence that

14  more than four adult businesses would be opened . . . even in the absence of any adult use

15  zoning regulations." *Young*, 216 F.3d at 822.  Similarly, in *Diamond*, the Ninth Circuit

16  held that a town ordinance that provided the sole entity seeking to open an adult

17  _____

18     [11] Citing *Isbell v. City of San Diego*, 450 F. Supp. 2d 1143, 1152 (S.D. Cal. 2006), Mr. McKibben argues that the County has not adequately shown demand because it has not provided evidence regarding

19  the number of unofficial inquiries into opening an adult cabaret that it received over the last 20 years.  Mr. McKibben's reliance on *Isbell* is misplaced for two reasons.  First, *Isbell* concerned a municipality that only provided the court information regarding the more expensive of the two tiers of licensing

20  applications it offered.  *Id.*  In contrast, the County's application fee of $350.00 is less expensive than both the $2300.00 and $500.00 options offered in *Isbell*, and hence less prohibitive.  (*See* 2d. Olson Decl.

21  (Dkt. # 37) ¶ 2, Exs. 1, 2.)  Second, Mr. McKibben has provided no evidence that the County maintained any system of tracking the free "over the counter" inquiries it may have received over the years, or, alternatively, that it was on notice that it should have tracked those inquiries.  *See id.*  Therefore, the

22  court finds that the County has presented adequate evidence regarding demand.

ORDER- 34

1   entertainment business with seven possible location sites was constitutional.  *See*

2   *Diamond*, 215 F.3d at 1058.   Finally, in *Tollis*, two adult entertainment businesses were

3   currently operation when the Ninth Circuit upheld an ordinance that permitted only eight

4   adult entertainment businesses to operate simultaneously on 68 parcels available in

5   unincorporated San Diego County.  *See Tollis*, 505 F.3d at 942 (affirming in relevant part

6   *Fantasyland Video*, 373 F. Supp. 2d at 1141)).

7         Here, the 80 sites available in unincorporated Snohomish County exceed the

8   maximum potential demand for 3 adult entertainment businesses by at least three times

9   the margins approved by the Ninth Circuit in *Young* and *Diamond*.  Although *Young* and

10  *Diamond* involved smaller municipalities than the County, *Tollis* affirms the applicability

11  of the supply and demand test to large, undeveloped unincorporated counties such as

12  Snohomish County.

13        The Ninth Circuit has cautioned that it must not be assumed that an ordinance

14  "will be automatically constitutional if demand does not exceed the supply of sites,

15  because such a conclusion is insufficient to account for the chilling effect that an adult

16  use zoning ordinance may have on prospective business owners."  *Isbell*, 258 F.3d at

17  1114 (quoting *Young*, at 822.)   Here, however, the excess supply of 80 sites could

18  lawfully absorb the theoretical demand associated with chilling effects of even a

19  substantial magnitude.  Moreover, there is no evidence that substantially more than three

20  adult businesses would be opened in the absence of any adult use zoning regulations.  *See*

21  *Young*, 216 F.3d at 822.  To the contrary, the fact that during the 12 years preceding the

22  zoning ordinance the demand for adult cabarets was for only zero to one venue suggests

ORDER- 35

1    that the magnitude of any chilling effect is low.  (Lubrin Decl. ¶¶ 8-9 ("Honey['s] is the

2    only strip club that has operated in unincorporated Snohomish Couty within the past 30

3    years.")  As such, the supply of sites available under the zoning regulations more than

4    satisfies the maximum demonstrated demand for adult entertainment venues.  *See Young*,

5    216 F.3d at 822; *Diamond*, 215 F.3d at 1058.

6                    **iv. Summary**

7            Taking into consideration the history of scant demand for adult entertainment

8    licenses relative to the number of available sites and their acreage, as well as the

9    population and character of the unincorporated area, the court finds the County has met

10   its burden on summary judgment to show that the number of sites available to adult

11   entertainment dance studios under the zoning regulations is sufficient to provide

12   reasonable alternative avenues of communication.  *See Young*, 216 F.3d at 821.

13                **IV.    CONCLUSION**

14           For the foregoing reasons, the court DENIES Mr. McKibben's motion for

15   summary judgment (Dkt. # 20) and GRANTS the County's motion for summary

16   judgment (Dkt. # 23).

17           Dated this 5th day of December, 2014.

18

19

20   _____

21   JAMES L. ROBART
     United States District Judge

22